MARTHA BALDRIDGE, A MINOR *v.* BARCON, INC.

5-5106                                449 S. W. 2d 185

Opinion delivered January 19, 1970

*Langston & Langston,* for appellant.

*Wright, Lindsey & Jennings,* for appellee.

J. FRED JONES, Justice. Vernon B. Baldridge filed suit in the Pulaski County Circuit Court against Barcon, Inc. for $750 in his own behalf for medical expenses and for $25,000 as father and next friend of his 14 year old daughter, Martha, for injuries she sustained while sliding on an amusement device known as "Magic Carpet Slide" belonging to and operated by Barcon. A jury trial resulted in a verdict as follows:

"We, the jury, find for the plaintiff, Vernon B. Baldridge, Jr., and fix his damages as follows: Ver-

non B. Baldridge, Jr., individually, $298.25; Vernon
B. Baldridge, Jr., on behalf of Martha Baldridge,
$-.0-.''

The trial court overruled Martha's motion for a new
trial and entered judgment on the verdict. Martha has
appealed and relies on the following points for reversal:

"The verdict was contrary to evidence and law.

The award of damages is inadequate, the jury hav-
ing found for the appellant and fixed her damages
at zero. The trial court should have granted a new
trial.

The jury refused to follow the court's instruction
No. 22 (AMI 2213) and to assess damages for Mar-
tha Baldridge.''

The exact forms of verdict submitted to the jury
are not in the record before us but the verdict as above
set out is recited in the judgment of the trial court and
this appeal actually turns on what the jury meant by
this verdict. The appellant states her interpretation of
the jury verdict in her brief as follows:

"The jury found for Vernon B. Baldridge, Jr., in-
dividually and in his own right and assessed his
damages at $298.25.

The jury found for Vernon B. Baldridge, Jr. on
behalf of Martha Baldridge and assessed her dam-
ages at zero.''

The appellee's position is stated in its brief as fol-
lows:

"The jury indicated that it found in favor of Ver-
non Baldridge. By not awarding damages to Mar-
tha Baldridge, it indicated in the only way it could
that it found against her.''

The appellee relies heavily on our holding in *Pigage* v. *Chism*, 237 Ark. 873, 377 S. W. 2d 32, and argues that in rendering an *inconsistent verdict* in the case at bar, the error lay in awarding damage to the secondary plaintiff, Mr. Baldridge, and not in the denial of damages to the primary plaintiff, Martha; that the appellee defendant is the only one who can be heard to complain of the error in awarding the damages to Mr. Baldridge individually, and that no such complaint has been registered in this case. Appellee's argument is predicated upon the theory that the jury actually returned inconsistent verdicts on liability in that they found in favor of Mr. Baldridge in his own right and in favor of Barcon and against Mr. Baldridge as father and next friend of Martha. We are unable to find, and we are unwilling to assume, such inconsistency from the wording of the verdict.

Our holding in *Pigage* is of little assistance here for in that case Mr. and Mrs. Pigage, Sr. sued for damages in their own right because of injuries to Pigage, Jr. and Mr. Pigage, Sr., sued as next friend for the damages sustained by Pigage, Jr. The jury returned three verdicts as follows:

" 'We the jury find in favor of the claim of E. J. Pigage, Senior, individually, and assess his recovery in the sum of $2,500.00.

We, the jury, find in favor of the plaintiff, Mary E. Pigage, individually, and assess her recovery in the sum of $500.00.

We, the jury, find in favor of the defendant as to the claim of E. J. (Tad) Pigage, Jr., by and through his next friend, E. J. Pigage, Sr.' "

Had the jury rendered such verdict in the case at bar as was rendered in *Pigage,* then our holding in *Pigage* would be good authority for the appellee's argu-

ment here. But the verdict in the case at bar is as consistent with a finding for Martha on liability as it is against her, and we are of the opinion that the rule in *Pigage* should extend only to verdicts that are clearly inconsistent. Perhaps it could be argued that the jury could have found against Martha in no other way than it did under the forms of verdict submitted to the jury. It could be argued just as logically that the jury could have found *for* Martha on liability and against her on damages in no other way than it did under the forms of verdict submitted. The forms of verdict are not of record but only alluded to in the briefs, but there is no evidence that Martha was any more responsible for the forms of verdict than was Barcon.

The appellee argues that the separate instructions within the formats of AMI 2212 and 2213, when considered together with the forms of verdict, make the verdict clear as against Martha. The court did give AMI 2212 and 2213 as plaintiff's instructions 21 and 22, as follows:

"If you decide for Vernon B. Baldridge, Jr. against Barcon, Inc. on his claim for damages resulting from injuries to Martha Baldridge, you must then fix the amount of money which will fairly and reasonably compensate him for the following element of damage which you find was proximately caused by the negligence of Barcon, Inc. or its employee:

a. The reasonable expense of any necessary medical care and treatment incurred on behalf of Martha Baldridge, his daughter.

Whether this element of damage has been proved by the evidence is for you to determine.

If you decide for Martha Baldridge on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate her

for any of the following elements of damage which you find were proximately caused by the negligence of Barcon, Inc. or its employee:

a.   The nature, extent, and duration of any injury.

b.   Any pain and suffering experienced in the past. Whether any of these elements of damage has been proved by the evidence is for you to determine.''

The trial court also gave plaintiff's instruction No. 5 and defendant's instruction No. 12, as follows:

''Vernon B. Baldridge, Jr., on behalf of Martha Baldridge, and Vernon B. Baldridge, Jr., individually, claims damages from Barcon, Inc., an Arkansas corporation, and has the burden of proving each of three essential propositions:

First, that they have sustained damages;

Second, that Barcon, Inc., or its employee was negligent;

And third, that such negligence of Barcon, Inc. or its employee was a proximate cause of the damages of Martha Baldridge and her father, Vernon B. Baldridge.

If you should find that Martha Baldridge was not guilty of negligence which was a proximate cause of the occurrence, then Vernon B. Baldridge is entitled to recover the full amount of any damages sustained by Martha Baldridge and Vernon B. Baldridge, which were proximately caused by any negligence of Barcon, Inc.

If you should find that the occurrence was proximately caused by negligence of both Martha Baldridge and Barcon, Inc., then you must compare the percentages of their negligence. If the negligence of Martha Baldridge was of less degree than the neg-

ligence of Barcon, Inc., then Vernon B. Baldridge is entitled to recover any damages sustained by Martha Baldridge and Vernon B. Baldridge as a result of the occurrence after you have reduced them in proportion to the degree of the negligence of Martha Baldridge.

On the other hand, if Barcon, Inc. was not negligent or if the negligence of Martha Baldridge was equal to or greater than the negligence of Barcon, Inc., then Vernon B. Baldridge, Jr. is not entitled to recover any damages sustained by either of them.''

When all these instructions are considered in the light of the jury's verdict, and especially in the light of the evidence, we are of the opinion that if the jury intended to find for Mr. Baldridge and *against* Martha, it must have arrived at such conclusion on the basis of Martha's own, or contributory, negligence, as compared with that of Barcon. When we examine the record for evidence of Martha's own negligence, we conclude that a verdict based thereon would be as consistent for Martha as against her.

The record reveals that Barcon, Inc. owned and operated a facility known as "Magic Carpet Slide" especially designed for the amusement of children. The "Magic Carpet Slide" consisted of fifteen fiberglass sliding lanes separated by dividers of the same material four inches in height and three inches wide. One end of the facility was elevated thirty-five feet above the ground and the other end was near the ground. People using the facility would climb steps on either side of the sliding lanes to a platform at the elevated end of the slide. A carpet, consisting of a strip of burlap, was furnished each user who would place the carpet in the sliding lane selected and the user would sit down on the carpet and draw the lower end of the carpet up over the feet and legs before starting down the slide. In some instances the user was started down the slide by a Bar-

con employee referred to as a "starter" who either pushed the user from behind or pulled the user forward by the hand or arm. Barcon sold tickets to customers who wished to use the slide and the tickets were taken up on admission to the slide.

Martha, along with some of her young friends, had purchased tickets and Martha had used the slide six or seven times before her injury. On about her eighth trip down the slide Martha became overbalanced, spun around on the slide and her right leg was broken. Martha alleged in her complaint as follows:

"Plaintiff slid down said slideway five (5) times but upon her sixth (6th) time, as she was preparing to slide down the slideway, and was totally unready, the 'starter' negligently grabbed plaintiff's right arm and negligently jerked and slung her down the slideway to begin and speed up her untimely descent. The 'starter's' negligent and violent jerking upon plaintiff's right arm and slinging and shoving her caused plaintiff to lose her balance and somerset down the slideway, and resulted in the plaintiff hitting her right leg upon the partition between the slides."

Barcon denied liability and alleged contributory negligence in failing to use ordinary care for her own safety and Martha's assumption of risk as a defense.

Lana Bowling testified, in part, as follows:

"Q. Now, how do you slide down, tell the jury how you slide down the slide, what happens when you get up to the top of the slide?

A. You lay your mat down, a piece of burlap, and you sit on one end and pull the other end over your feet and hold on to it with both hands.

Q. Did you do that?

A.  Yes, sir.

Q.  Now, how many times had you done this before Martha here broke her leg?

A.  About seven.

\*    \*    \*

Q.  Now, will you tell us just what happened to Martha?

A.  We were in sections by each other, we were going to slide down at the same time and her mat was . . . they were both laid on at the same time and we both sit on them and I had got mine pulled over my legs and was holding on to it and Martha had already been started and she had just sit on her carpet, and had not had the time to hold on to anything.

Q.  You mean she hadn't been able to hold on to her burlap bag with her hands?

A.  No.

Q.  She hadn't taken hold of it?

A.  No.

Q.  Then what happened?

A.  She was already going down and the attendant pulled me down and I saw her swerving from side to side and she screamed and called my name.

Q.  She screamed and called your name?

A.  Yes.

Q.  Then she went right down the slide fast, is that correct?

A. Yes.

Q. What happened after that?

A. I saw her, she kind of turned a summersault and laid over into the next section.

\* \* \*

Q. Now, at the top of the slide, the attendant took her by her right arm, is that what you said?

A. Yes.

Q. And then after he took her by the right arm, what did he do?

A. He pulled her down.

Q. And you state that was before she could get ahold of her burlap bag to hold on?

A. Yes, sir.''

Martha testified that she was not ready to start down the slide but was reaching down with her hands to draw the end of the carpet up over her feet and legs when the young man doing the starting pulled her right arm and started her fast down the slide. She testified that she was off balance all the way down the slide from the time she was started until her foot struck a partition. Martha continued, in part, as follows:

''Q. I don't know if we pointed it out or not but do you know where you were when you hit the partition on the side of the slide?

A. I was somewhere along here about the third hump.

Q. The third hump, are you talking about this

hump right before you get to the bottom, in other words we see a big drop off, a second drop off and this is the last one before you get to the bottom?

A. Yes.

Q. Do you remember what happened to your foot . . . did your foot get off the mat, by the way?

A. (No answer)

Q. Do you remember?

A. No, sir.

Q. What kind of shoes did you have on?

A. Tennis shoes.

Q. Do you remember where you ended up, where you stopped?

A. Yes, sir, there's a long place where you go on down to the bottom.

Q. Are you talking about the place before you get to the mat at the end?

A. Yes, sir.

Q. Were you on that level place at the bottom when you stopped?

A. Yes, sir."

Mr. James R. Long, Sr. testified that his oldest son was working at the slide on the day of the accident and that his three younger sons were using the slide. He says that his youngest son was coming down the slide beside Martha and that he was watching them from the

ground. He testified, in part, as follows:

"Q. Did you see the accident happen?

A. Yes, sir, I did.

Q. Where on the slide was Martha when the accident happened?

A. She was on the last slope going down to the lower level.

Q. Could you tell what caused her to stop, what caused her to have trouble there at the bottom?

A. Well, her legs were flopping, seems like she was some what off balance and her foot hit the side of the slide and, in fact, I remarked at the time that it happened that that girl broke her leg, you could hear the bone pop.

Q. Did she stop right where it happened?

A. Yes.

Q. And that was at the bottom?

A. Yes, sir."

On cross-examination he testified as follows:

"Q. Did you see her when she left the top?

A. No, sir, I did not.

Q. How far down the slide was she when you first saw her?

A. About half way down.

> Q. And was it at that point that you noticed her legs flopping?
>
> A. It was just a little lower than that, my youngest [sic] was sliding down in the lane right beside her on this side of her, that would be the south side lane, and that's what caught my attention, her legs started flopping."

George Fike, Jr. testified that he was working at the slide on the day Martha was injured and that three or four young men worked at the top of the slide. He testified that there was a large crowd using the slide and that the employees were in a hurry to get them down the slide, and as to the procedure used, he testified:

> "Q. How did they start these young people down these slides?
>
> A. Well, when the young people came up the stairs, they brought a burlap bag with them and we got the bag and laid it down for them and set them on it, they put it over their feet so they couldn't touch the slide, and we asked them if they wanted a push or a pull, and if they didn't say anything, we just walked on to somebody else. If they wanted a pull, we pulled them, if they wanted a push, we pushed them down, and did the next person just like that."

Mr. Fike did not see the accident and didn't know anything about it at the time it occurred.

Mr. Coney testified that he is part owner of the "Magic Carpet Slide" and had about five or six people working at the top of the slide on the day of the injury. He did not see the accident.

James Reed Long, Jr. testified that he was taking up tickets at the time Martha was injured; that he heard

her "squeal" or scream; that he looked up and then went to the bottom of the slide to assist. He testified that the platform was crowded with customers and that both stairs were jammed. He helped take Martha to the hospital following her injury and testified, in part, as follows:

"Q.  My question was, did she say anything about what caused the accident or how she fell?

A.  No, sir, not that I can recall, except that her tennis shoes struck the side of the slide.

Q.  Did she say anything about anyone at the top having caused her to fall?

A.  No, sir."

On cross-examination Mr. Long, Jr. testified as follows:

"Q.  How fast do people go down the slide, can you tell the jury?

A.  I couldn't judge the miles per hour, it seems pretty fast going down and sometimes you can clear the air going over the hump, I mean, clear the track, but not very much, just a little bit.

Q.  What was the purpose of these employees at the top of the slide in yellow shirts to give them a pull, what was the purpose of that?

A.  To get people started down the slide.

Q.  To get them started down the slide?

A.  Yes, sir.

Q.  Would that make them go faster?

A. Well, sometimes, depends on how hard you pull.

Q. Did you pull any faster with a large crowd there?

A. We just tried to get them down in some kind of succession so it wouldn't become too crowded up there.

Q. And on this day, you had a crowd up and down each side of the slide and the platform was full?

A. Yes, sir."

The only evidence of contributory negligence attributable to Martha is extremely vague and circumstantial in nature. Martha was over half way down the slide when her tennis shoe came in contact with the slide or partition, and she told Mr. Long on the way to the hospital that her tennis shoe struck the side of the slide and she did not say anything about anyone at the top causing her to fall. We are unwilling to assume that the jury found against Martha on such vague and weak circumstantial evidence.

Under the evidence in this case, and under the instructions of the trial court, we do not interpret the jury verdict as finding for the appellant, Vernon B. Baldridge, in his own behalf and against Vernon B. Baldridge on behalf of Martha. On the contrary, we interpret the verdict as finding for Vernon B. Baldridge on behalf of himself and Martha with attending failure to award damages for Martha or specifically find that she had none.

The forms of verdict are not of record, neither were they objected to nor are they explained. Neither side made any effort to ascertain the intention of the jury before it was discharged, so we conclude that the judg-

ment should be reversed and this case remanded for a new trial.

Reversed and remanded.

BROWN and FOGLEMAN, JJ., concur.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result reached in this case and substantially with the opinion. Since we do not know what forms of verdict were submitted to the jury, I do not think that we would be justified in assuming that the return of zero damages on Vernon B. Baldridge, Jr.'s action in behalf of his daughter Martha was a finding of no liability. The verdict signed definitely states that the jury found for him on her behalf. This simply means to me that the jury refused to assess damages in her favor. In the case of *Pigage* v. *Chism*, 237 Ark. 873, 377 S. W. 2d 32, there was a *definite* verdict against the principal party, *i. e.*, the minor. At the same time there was a definite verdict in favor of the secondary parties, *i. e.*, the parents of the minor. If we could say that this was the case here, then the rule declared in that case would be applicable.

I do not feel that the evidence as to contributory negligence and assumption of the risk by Martha Baldridge is so vague, weak and circumstantial that a jury verdict against her on the basis of comparative negligence would not be substantially supported or that there would not be a jury question on these defenses. I realize that the majority is not so holding, but is merely saying that it is unwilling to assume that there was a jury verdict against her on the question of liability. The description of the evidence in the majority opinion, however, seems to me to be such that a reader might draw the inference that it was so vague, weak and circumstantal as to justify a directed verdict on those defenses on a retrial. I do not believe that this is so or is intended.

BROWN, J., joins in this concurrence.